

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GINA MARIN, on behalf of herself and all other
similarly situated,

                  Plaintiff,

     v.

310 BOWERY GROUP, LLC d/b/a 310 BOWERY
BAR and EPSTEIN'S BAR, LLC d/b/a 82
STANTON BAR, and RICHARD AURIGEMMA**,**

                 Defendants.

24-cv-01340 (SLC)

## DECLARATION OF JOSEF NUSSBAUM

I, Josef Nussbaum, under penalty of perjury, affirm as follows:

     1.     I am a partner with Joseph & Kirschenbaum LLP ("JK"), Plaintiff's counsel in this

action.  I submit this declaration in response to Defendants' opposition to our firm's motion for

attorneys' fees as part of the class action settlement in the above-referenced matter. ECF No. 99.

### JK'S COMMUNICATIONS WITH OPT-IN PLAINTIFFS AND CLASS MEMBERS

     2.     In or around June 24, 2024, the Claims Administrator[1] provided the Parties with a

status report in which they indicated that only 22 of 275 Class Members (or 8% of the Class) had

submitted Claim Forms.

     3.     Over the last two decades, our office has handled tens of wage and hour class

actions against hospitality industry employers in New York State and, in our experience, the 8%

claims rate was unusually low for this type of wage and hour class action.

---

[1] Capitalized terms in this declaration track the definitions of the capitalized terms in the parties settlement agreement. *See* ECF No. 91-1.

4.      Accordingly, I contacted the Named Plaintiff and Opt-In Plaintiffs to ascertain if they knew why the claims rate was so low.

5.      In my conversations with the Named Plaintiff and the Opt-In Plaintiffs, I discovered that that Defendants had not identified certain Class Members who were only entitled to the Alternative Minimum Benefit of $150 thus leading to these individuals being allotted a full share of the settlement. As set forth below, this led to more than 38% of the NSF that was unlikely to be claimed. *See infra* ¶¶ 14-25.

6.      To the best of my knowledge, after my conversations with the Named Plaintiff and Opt-In Plaintiffs, these individuals communicated with their former coworkers about the case.  As a result of those communications, some Class Members contacted me directly.

7.      Attached hereto as Exhibit 1 is a chart outlining the information that the Court Ordered us to produce in its July 17, 2025 Order. ECF No. 102.

8.      In sum, I spoke to 32 individuals other than the Named Plaintiff.  Three of these individuals are opt-in Plaintiffs with whom I conversed regularly and with whom I initiated communications.

9.      For 22 of the remaining 29 individuals, my records establish that they initiated contact with me.

10.     For the 7 remaining Class Members with whom I communicated, I have records of myself calling them. That said, for at least some of these individuals, I recall having had communications with them prior to those phone calls. However, given the nature of our client base and how they communicate, *i.e.*, from multiple phone numbers to multiple phone numbers and from/to multiple modes of communication (e.g., phone, text, Whatsapp, voicemails, through

friends, etc.), I have been unable to locate records of my first discussion with them and thus cannot state for certain that I did not initiate contact with any of them.

11.     I have attached spreadsheets listing the requested information for individuals in each of these categories.

12.     I did not pressure or coerce any of the 32 Class Members with whom I communicated to join the case as Claimants.

13.     For the sake of completeness, aside from the individuals identified in Exhibit 1, I also tried calling other class members who either did not pick up my call or for whom I left a non-substantive voice message (*e.g.*, my name, phone number, and the name of the case, *not* any substance about claim forms, etc.). To the best of my recollection and records, I ultimately did not communicate with these individuals.

## DEFENDANTS FAILED TO ABIDE BY THE COURT'S PRELIMINARY APPROVAL ORDER AND DID NOT PROVIDE A COMPLETE AND ACCURATE CLASS LIST

14.     On March 24, 2025, the Court entered an Opinion and Order preliminarily approving the class action settlement in this case. ECF No. 93.

15.     In the Preliminary Approval Order, the Court instructed Defendants to "provide the Claims Administrator and the Firm a list of Class Members containing the information required by the Agreement (the "Class List")." *Id*. at 23.

16.     Paragraph 9 of the Agreement in this matter defines the Class List as:

> A list of all Class Members identified by: (i) name; (ii) last known address (to the extent Defendants possess this information); (iii) Social Security Number (to the extent that Defendants possess this information); (iv) hours paid by 310 Bowery Bar and 82 Stanton at the tip credit minimum wage from February 22, 2018 until May 8, 2024; and (v) tips received at 310 Bowery Bar between February 22, 2018 until May 8, 2024. **The Class list shall identify all Class Members that executed a release of wage and hour claims during the pendency of this litigation.**

ECF No. 90-1 ¶ 1.9 (emphasis added).

17.     Paragraph 2.5(A) of the Agreement provides that:

Within fourteen (14) days after the Court issues the Preliminary Approval Order, **Defendants' Counsel** will provide the Settlement Claims Administrator and Class Counsel the Class List.

*Id*. at ¶ 2.5(A) (emphasis added).

18.     Paragraph 3.4(A)(1) of the Agreement provides that:

Notwithstanding the formulas agreed upon by the Parties, any Class Members who previously executed a release of wage and hour claims against Defendants during the pendency of the litigation shall only receive the Alternative Minimum Benefit.

*Id*. at ¶ 3.4(A)(1).

19.     Given the March 24, 2025 Preliminary Approval Order, the Class List was due to be provided by Defendants by April 7, 2025.

20.     Despite the Court's Order, Defendants did not provide the Class List until April 16, 2025. Defendants did not provide an explanation as to why the Class List was not served on time.

21.     Moreover, in or around June 26, 2025 (*i.e.*, just 10 days before the Bar Date), it came to my attention that the Class List Defendants provided the Claims Administrator failed to identify the Class Members that had executed a release of wage and hour claims ("Releasee Class Members").

22.     Accordingly, rather than assigning these individuals the Alternative Minimum Benefit as required by the Agreement, the Claims Administrator unwittingly assessed that these individuals would receive a full share of the settlement proceeds and informed them as such in the Court Ordered Notice process.

23.     As a result of Defendants' failure to properly identify these individuals, the Claims Administrator attributed more than 38% of the Net Settlement Fund ("NSF"), or roughly $179,000 of the roughly $465,000 NSF, to individuals who should have only been receiving the Alternative

4

Minimum Benefit ("AMB") of $150. (In fact, the total amount of the AMB that these 33 individuals were entitled to totaled less than $5,000).

24.     In other words, by diverting funds to the individuals who had signed releases with Defendants and were thus not likely to submit a Claim Form in the settlement, Defendants essentially created more than 38% of "dead money," *i.e.*, portions of the NSF which would almost certainly not be claimed.

25.     Not surprisingly, at the time that this issue came to Class Counsel's attention in late June 2025, only 1 of the 33 Releasee Class Members had submitted a Claim Form (despite that, on average, Releasee Class Members were mistakenly informed that they were entitled to more than $5,000).

## THE *PANORA V. DEENORA CORP.* CASE

26.     The only case Defendants rely on for their request for sanctions is *Panora v. Deenora Corp.*, 521 F. Supp. 3d 177 (E.D.N.Y. 2021).

27.     After assessing a $2,000 sanction in plaintiff's counsel for improper communications in that case, Judge Cogan noted that:

> Finally, in the event of a settlement or plaintiff's verdict, the Court may reduce any claim for reasonable attorneys' fees based on the action proceeding as a collective.

*Id.* at 181.

28.     At the Fairness Hearing in this matter, the Court noted (presumably based on the above quote) that:

> Judge Cogan's decision in Panora is not 100 percent on point, but it has some aspect -- I don't think we're in sanctions land, but he does allude to the fact that it may -- and I didn't look at the docket in his case. You have to see if he actually did ultimately reduce attorneys' fees in that case. I don't know.

A copy of the transcript of the July 17, 2025 Fairness Hering in this case is attached as Exhibit 2 (at 37:16-23).

29.     After reviewing the docket of the *Panora* case, it is clear that Judge Cogan did *not* assess any further sanctions on the basis of plaintiff's counsel's improper conduct there and he remarked that any "further reduction in the fee award for that reason would be doubling up." A copy of the fee award order in that case is attached as Exhibit 3 at 10.

30.     Accordingly, the only sanction that Judge Cogan ordered for the improper communications in *Panora* was $2,000.

## CLASS COUNSEL'S UPDATED COSTS

31.     In our firm's motion for approval of fees and costs, we listed the following costs that we incurred in the litigation:

| Description of cost | Total Cost |
|---|---|
| Filing fee | $405.00 |
| Service of Complaint | $332.64 |
| Transcript Request fees | $196.56 |
| Mediation fees | $4,420.00 |
| **Total** | **$5,354** |

32.     Since the Fairness Hearing we received two additional invoices for mediation fees and for the transcript of the Fairness Hearing. These additional fees are $3,399.00 and $398.58, respectively for an additional total of **$3,797.58**.

33.     Receipts for all these costs are attached as Exhibit B to the letter our firm filed contemporaneously with this declaration.

34.     Accordingly, we respectfully request that the Court award the revised amount of **$9,151.58** in costs we incurred litigating this case.

Dated: July 23, 2025                          /s/ *Josef Nussbaum*
                                            Josef Nussbaum



EXHIBIT 1

## I. Communications With Opt-In Plaintiffs

| Class Member Name | Date of Communication | Communication Initiated By | Date Claim Form Filed | Value of Claim |
|---|---|---|---|---|
| Sienna Shumate (Opt-in Plaintiff) | Multiple occasions | Josef Nussbaum | 6/23/25 | $3,235.18 |
| Autumn Smith (Opt-in Plaintiff) | 6/25/25 | Josef Nussbaum | 6/25/25 | $15,140.03 |
| Victoria Sievers (Opt-in Plaintiff) | Multiple occasions | Josef Nussbaum | 6/26/25 | $28,917.35 |

## II. Communications Initiated By Class Members

| Class Member Name | Date of Communication (there may have been additional dates) | Communication Initiated By | Date Claim Form Filed | Value of Claim |
|---|---|---|---|---|
| Henry R Raymond | 7/2/25 | Client | 5/13/25 | $12,614.96 |
| Alice Lemme | 7/2/25 | Client | 5/14/25 | $1,402.90 |
| James Piptone | 7/2/25 | Client | 5/20/25 | $150.00 |
| Hailey Sichel | 6/26/25 | Client | 6/11/25 | $6,045.91 |
| Carly Rubin | 7/1/2025, 7/2/2025 | Client | 6/12/25 | $781.84 |
| Rachel Sumner | 6/27/2025, 6/30/2025 | Client | 6/20/25 | $5,270.03 |
| Sarai Rios | 6/26/2025, 7/1/2025 | Client | 6/26/25 | $11,408.13 |
| Aimee Garcia | 6/26/2025, 6/29/2025 | Client | 7/1/25 | $10,480.58 |
| Alejandro Polanco | 7/1/2025, 7/3/2025 | Client | 7/3/25 | $150.00 |
| Anthony Flores | 7/3/25 | Client | 7/3/25 | $3,820.28 |
| Bryan Sanchez | 7/1/2025, 7/2/2025 | Client | 7/3/25 | $9,959.73 |
| Dylan Sanchez | 7/2/2025, 7/3/2025 | Client | 7/3/25 | $5,828.49 |
| German Hernandez | 7/1/2025, 7/2/2025 | Client | 7/3/25 | $9,012.63 |
| Giron Lopez | 7/1/2025, 7/2/2025 | Client | 7/3/25 | $150.00 |
| Jaclyn Mazza | 7/3/25 | Client | 7/3/25 | $4,212.25 |
| Katy Johnston | 7/2/25 | Client | 7/3/25 | $703.75 |
| Lindsay Postupka | 7/2/25 | Client | 7/3/25 | $153.87 |
| Mareli Miniutti | 7/3/25 | Client | 7/3/25 | $2,686.45 |
| Jacob Schueler | 7/3/2025, 7/6/2025, 7/7/2025 | Client | 7/7/25 | $2,602.91 |
| Kayla Neska | 7/3/2025, 7/6/2025 | Client | 7/7/25 | $3,047.77 |
| Natalia Wierzbowska | 7/7/25 | Client | 7/7/25 | $3,005.82 |
| Helen Mann | 7/3/2025, 7/6/2025 | Client | 7/8/25 | $2,772.13 |

## III. Communications For Which We Have Been Unable To Locate Records Of Who Initiated

| Class Member Name | Date of Communication (there may have been additional dates) | Communication Initiated By | Date Claim Form Filed | Value of Claim |
|---|---|---|---|---|
| Ali Goldberg | 6/30/25 | Unclear - See Nussbaum Declaration | 6/30/25 | $3,580.33 |
| Meaghan Vocino | 6/26/25, 6/29/2025 | Unclear - See Nussbaum Declaration | 6/30/25 | $6,414.87 |
| Madeline H Robertson | 6/30/25 | Unclear - See Nussbaum Declaration | 7/1/25 | $3,144.21 |
| Danielle Gonzalez Quevedo | 6/30/2025, 7/3/2025 | Unclear - See Nussbaum Declaration | 7/3/25 | $4,850.16 |
| Jos Mejia | 7/2/25 | Unclear - See Nussbaum Declaration | 7/3/25 | $1,146.68 |
| Josephine Christian | 6/30/2025, 7/1/2025 | Unclear - See Nussbaum Declaration | 7/3/25 | $7,310.37 |
| John Gaffney | 6/30/25 | Unclear - See Nussbaum Declaration | n/a | n/a |



EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------:

GINA MARIN on behalf of      : Docket No.: 24-cv-1340

herself and others similarly:

situated,                    :

            Plaintiff,    :

      v.                  :

310 BOWERY GROUP LLC,        : New York, New York

et al.,                      : July 17, 2025

          Defendants.  :

----------------------------:

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE SARAH L. CAVE

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      JOSEPH, HERZFELD, HESTER &
                    KIRSCHENBAUM
                    BY:  Daniel M. Kirschenbaum, Esq.
                         Yosef Nussbaum, Esq.
                    32 Broadway - Suite 601
                    New York, New York 10004


For Defendant:      KAUFMAN DOLOWICH & VOLUCK LLP
                    BY:  Aaron N. Solomon, Esq.
                    135 Crossways Park Drive-Suite 201
                    Woodbury, New York 11797

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

1          THE DEPUTY CLERK:  Your Honor, this is in

2    the matter of Marin v. 310 Bowery Group LLC, et al,

3    24-cv-1340.

4          Counsel, please state your appearance for

5    the record.

6          MR. KIRSCHENBAUM:  Daniel Maimon

7    Kirschenbaum and Yosef Nussbaum for plaintiffs.

8    Good afternoon, your Honor.

9          THE COURT:  Good afternoon.

10          MR. KIRSCHENBAUM:  Long time, no see.

11          THE COURT:  Okay.  Nice to see you.  Thank

12    you.

13          MR. SOLOMON:  Aaron Solomon for defendants.

14    With me is Megan Beloff.  She's not admitted, but

15    she worked on the case.

16          THE COURT:  Okay.  She can sit next to you.

17    It's fine.

18          MR. SOLOMON:  Oh, okay.  Come on up.

19          THE COURT:  It's just that you look a

20    little lonely sitting there.

21          MR. SOLOMON:  Yeah.

22          THE COURT:  Yeah.

23          MR. SOLOMON:  Thank you, your Honor.

24          THE COURT:  Okay.  Just give me one second.

25          So we're here this afternoon on a fairness

1  hearing with respect to the settlement that the

2  parties reached back in March.

3        On March 24, 2025, at ECF Number 94, the

4  Court entered an order preliminarily approving the

5  class action settlement and providing for notice.

6  At that time, the Court preliminarily approved the

7  settlement set forth in the parties' settlement

8  agreement as being fair, just, reasonable, and in

9  the best interest of the settlement class.  And the

10  Court also conditionally certified a settlement

11  class pursuant to Federal Rule of Civil Procedure

12  23(b)(3) and 29 U.S.C. § 216(b).

13        And, thereafter, pursuant to the Court's

14  order and the parties' settlement agreement, we

15  understand that notice was mailed and distributed to

16  the class by the class administrator.

17        So what I would like -- how I'd like to

18  proceed today is to, first, focus on making the

19  record with respect to whether the Court should

20  finally approve the settlement agreement and enter a

21  final judgment in this case.

22        And then I understand that the parties have

23  a disagreement with respect to attorneys' fees and

24  some matters related to that, and so we can then

25  address that.  But first, let's try to make a clean

1   record with respect to the substance of the

2   agreement, including Mr. Kirschenbaum or

3   Mr. Nussbaum -- whoever prefers -- to lay out, since

4   the Court entered the preliminary approval order,

5   the process of sending out notice and receiving

6   proofs of claim, if you would.

7            MR. KIRSCHENBAUM:  Yes, your Honor.

8            So you don't want to talk about the

9   substance of the agreement first?

10           THE COURT:  It's unnecessary to.  We

11  understand.  But feel free to lay out as much as you

12  would like.  It's up to you.

13           MR. KIRSCHENBAUM:  Well, just only inasmuch

14  as it relates to the reaction to the class, which is

15  a development since the notice went out.

16           The notice went out as planned to 275

17  people.  Of that group, there were no opt-outs.

18  There were 65 claimants.

19           It's important to note, though, besides

20  that claimant rate is in and of itself an acceptable

21  claimant rate in SDNY, as we cited in our brief.

22           THE COURT:  It's acceptable or

23  unacceptable?

24           MR. KIRSCHENBAUM:  It is, yes, acceptable.

25           THE COURT:  Yes, acceptable.

1          MR. KIRSCHENBAUM:  It is also sort of --
2     the number is sort of skewed because there's a
3     very -- there would be a very large amount of
4     participants who only would have been receiving the
5     alternative minimum benefit because they worked
6     there for either -- either because they worked there
7     for a very short time or because they already
8     received money from defendants and signed the
9     release.
10          THE COURT:  Right.
11          MR. KIRSCHENBAUM:  So despite the fact that
12    it's, let's say, somewhere between 20 and 25
13    percent, it's like 23.67 percent of the people that
14    opted in.
15          THE COURT:  Right.
16          MR. KIRSCHENBAUM:  It's actually a very
17    large percent of the money that was claimed in the
18    lawsuit and that was recovered as part of the
19    settlement.
20          So, all in, we believe the reaction to the
21    class.  There were no opt-outs, no objections,
22    except from defendants themselves.  And there
23    were -- there was a good participation rate.
24          I'm happy to sort of dovetail that into the
25    other issue.

1          THE COURT:  Yes.  Sure.

2          If I could just ask you to tell me the 65

3     claimants who have submitted proof-of-claim forms --

4     first of all, those claimants have been validated,

5     and all of them have been approved as entitled to

6     receive money pursuant to the settlement?  Or is

7     that still an open question?

8          MR. KIRSCHENBAUM:  Yeah, to the best of my

9     knowledge, there is no dispute.

10          THE COURT:  Okay.  And how much -- what's

11     the monetary amount that those 65 claimants

12     represent?

13          MR. KIRSCHENBAUM:  It's like -- it's 62

14     percent of the settlement class fund.  I believe the

15     number is -- covers around 287,000.

16          THE COURT:  287-.

17          MR. KIRSCHENBAUM:  And I have it here.  The

18     number is 287,978.

19          THE COURT:  -978.  Great.

20          MR. KIRSCHENBAUM:  And 66 cents.

21          THE COURT:  Okay.  And 66 cents.  Very

22     important.  Thank you.  Okay.

23          And so can you elaborate for me -- the

24     defendant has raised issues with some of your

25     conduct.  And I'll give Mr. Solomon a chance to

1    fully elaborate on that.

2         But were there efforts that plaintiffs'

3    counsel took to contact members of the class, aside

4    from the mailing and distribution procedures set

5    forth in the preliminary approval order and the

6    settlement agreement?

7         MR. KIRSCHENBAUM:  Yes and no.

8         We spoke to our class, to named plaintiffs

9    and opt-in plaintiffs and/or people contacted us

10   from the absent class members, and simply explained

11   to them that the claims rate to date was low.  Some

12   people called with questions about the -- about

13   their numbers and became known to us as -- because

14   of the word limit, we didn't lay it out in great

15   detail.

16        But did your Honor follow the wide

17   alternative minimum benefit, sort of, skewed the --

18        THE COURT:  Yes.

19        MR. KIRSCHENBAUM:  Yeah.  So we had to

20   explain that to people.  And then when we did, all

21   of a sudden, more people started opting in.

22        That said, I do want to state that I do not

23   think that there is any issue at all if we had

24   contacted absent class members directly, though, to

25   my knowledge, we did not actually do that.  I have

1    no recollection of doing that.  Mr. Nussbaum has no

2    recollection of doing it either.

3              THE COURT:  So any -- are you representing

4    to the Court that any interactions you had with

5    named opt-in or other class members were initiated

6    by the class members as opposed to your firm?

7              MR. KIRSCHENBAUM:  We initiated contact

8    with named people and opt-in people who we had

9    already been in touch with from before.  Any

10   interaction that we had with absent class members

11   that had not already opted in were people who

12   initiated contact with us.

13             THE COURT:  Okay.  And approximately how

14   many people in this group of named, opt-in, or other

15   people who contacted you -- how many claimants would

16   you say that is?

17             MR. KIRSCHENBAUM:  20 to 30.

18             THE COURT:  Okay.  And do you have a list

19   of who those claimants are that you had this contact

20   with?

21             MR. KIRSCHENBAUM:  We probably can put it

22   together.

23             THE COURT:  Okay.

24             Okay.  Thank you.  Anything else?

25             I'll let Mr. Solomon speak, and then you

1    will have an opportunity to respond.  But anything

2    else you would like to say on the attorneys' fees

3    issue?

4         MR. KIRSCHENBAUM:  Yeah.  I -- well,

5    related to this or --

6         THE COURT:  Yes.

7         MR. KIRSCHENBAUM:  Yeah.  And related to

8    this, I do think -- and that it is our goal as class

9    counsel to try and get as many people who are

10   releasing their claims as possible to actually get

11   their money if their claims are being released.

12        So while I truthfully represent to your

13   Honor that the communications were limited, as said,

14   I feel sort of like that we should not have -- not

15   have to answer your Honor's question, but I don't

16   think that this is something that class counsel

17   should have to defend in terms of there is an

18   attorney-client relationship.  If people are

19   releasing their claims, that that's not in

20   contradiction to Rule 23's method of notice, which

21   is a method of notice which must be done to satisfy

22   due process.  That doesn't supplant the ordinary

23   attorney-client relationship.

24        And I -- and the reason I bring this up is,

25   because I am oftentimes in a claims-made settlement,

1    and I certainly would not like for there to be a

2    precedent that class counsel is not able to assist

3    class members in filing notices to collect their

4    money.

5              In fact, I find that there is a great deal

6    of case law out there wherein judges in this

7    district and in state court and elsewhere have, to

8    the contrary, found that situations where there's

9    sort of like a wink-wink agreement between

10   plaintiffs' counsel and defendants' counsel, like,

11   hey, we're going to have -- we'll do a claims-made

12   so your client ends up paying less, is -- borders on

13   collusive behavior.  And, you know, I would like

14   to --

15              THE COURT:  Right.

16              MR. KIRSCHENBAUM:  -- state on the record

17   that 100 percent, every time that I enter into a

18   claims-made settlement with any defendant, it is 100

19   percent my goal that 100 percent of that money gets

20   claimed.  And I don't feel like --

21              THE COURT:  Understood.

22              MR. KIRSCHENBAUM:  -- we should held back

23   from that.

24              THE COURT:  Okay.  I understand.

25              MR. KIRSCHENBAUM:  One more point, your

1   Honor.

2           THE COURT: Yes, of course.

3           MR. KIRSCHENBAUM: Defendants agreed to not

4   oppose our motion for attorneys' fees unless our

5   motion was inconsistent with the agreement, not

6   that -- that doesn't include behavior that they

7   feel -- other behavior that they feel violates the

8   agreement.

9           What it means is, if the application is not

10   consistent with what we said we would apply for in

11   the agreement, and we made the application exactly

12   as we said we would in the agreement, so defendants

13   are completely without right to oppose our motion.

14           THE COURT: I understand.

15           The last question I have for you right now

16   is that it looks to me, but you can correct me if

17   I'm wrong, that, with respect to costs, I think you

18   outlined those in your declaration, but I don't

19   believe that we have receipts or invoices for those.

20           Do you have invoices or receipts for the

21   costs that you're seeking?

22           MR. KIRSCHENBAUM: Absolutely.

23           THE COURT: Okay.

24           And I think we're going to have some

25   follow-up submissions here, so among them are going

1    to be the cost invoices, but we'll address all that

2    at the end.  So thank you very much.

3              MR. KIRSCHENBAUM:  Thank you, your Honor.

4              THE COURT:  Go ahead, Mr. Solomon.

5              MR. SOLOMON:  I kind of want to start at

6    the first point.

7              THE COURT:  Okay.

8              MR. SOLOMON:  You know, when I look at Rule

9    23 and § 216(b), it's a hybrid settlement, right?

10             THE COURT:  Right.

11             MR. SOLOMON:  So 216(b), the notice process

12   is controlled.  That's *Hoffmann*.  It's undisputed.

13             *Panora v. Deenora* that I cited was my case,

14   so --

15             THE COURT:  Yep.

16             MR. SOLOMON:  -- that was a fun one.

17             THE COURT:  Right.

18             MR. SOLOMON:  So --

19             THE COURT:  Lots of interesting things

20   going on there.

21             MR. SOLOMON:  Yeah, I could tell you

22   stories about that.

23             So, you know, that's that half of it in my

24   mind.

25             The second half is obviously Rule

 1    23(c)(2)(B), right, which puts in the notification

 2    procedure on a class-action settlement.

 3              During a notification period, in my mind,

 4    you don't play around.  You comply with the Court's

 5    order.  You file notification the right way.  And as

 6    I explained to counsel just now, if they had a

 7    problem or they were worried about the level of

 8    response -- which so were we when it was low -- pick

 9    up the phone.  Call me.  We'll negotiate something.

10    We'll come back to court and get it approved.

11              Don't go off the reservation and call

12    people.  Your attorney-client relationship does not

13    allow you to step out of the bounds of notification.

14    Just like when a class is certified, does plaintiff

15    all of a sudden get to call people up and say, hey?

16    No.  That's why the rule exists, right, because

17    there are due process issues involved.

18              And that's an issue for me.  I brought a

19    settlement.  I want to protect it.  I'm concerned

20    about what happened because it affects my client's

21    due process rights.

22              THE COURT:  In what way does it affect your

23    client's due process rights?

24              MR. SOLOMON:  Because I do not know what he

25    said to these people.  And because of that, if one

1    of them comes back and challenges the settlement for

2    whatever reason, I may have a problem.

3            THE COURT:  How could they?  How could they

4    do that?

5            So they have already --

6            MR. SOLOMON:  Because they can say --

7            THE COURT:  Just let me finish, please.

8            MR. SOLOMON:  Go ahead.

9            THE COURT:  Don't interrupt me.

10            If the opt-out deadline has passed and

11    nobody has come forward and objects and the Court

12    enters final judgment approving the settlement, how

13    would anyone -- what would be the vehicle for anyone

14    to challenge the settlement at that stage?

15            MR. SOLOMON:  What were they being -- what

16    were they told?  If they were not told all of the

17    factors under Rule 23(c)(2)(B) when he spoke to

18    them, that's a problem for me, a great problem.

19            THE COURT:  But didn't they get that in the

20    notice?

21            MR. SOLOMON:  I don't know.  53 notices

22    returned undeliverable.  I don't know whether or not

23    these people -- you know, I don't know what

24    happened.  I don't know what they were told at the

25    time.  And I don't want somebody coming back to say

1    that when they had a conversation with class

2    counsel, class counsel did not say something that

3    they should have said.

4              THE COURT:  I understand.

5              MR. SOLOMON:  It's a complete mystery to

6    me.

7              THE COURT:  Right.

8              MR. SOLOMON:  And that's not fair.

9              THE COURT:  I understand.

10             MR. SOLOMON:  And that's why you come back

11   to the well and you fix it.  You come back and say,

12   maybe we'll do it in a text message, maybe we'll

13   send the notice out again.  There's ways to do

14   things and ways not to do things to protect both

15   parties.

16             THE COURT:  What about if we draw a

17   distinction between the people who reached out to

18   either the claims administrator or the plaintiffs'

19   firm affirmatively?  So that would suggest that

20   people had gotten the notice and had questions about

21   it.

22             Are you saying that there's something

23   improper about plaintiffs' counsel speaking to those

24   people?

25             MR. SOLOMON:  That's different.

1           THE COURT:  Okay.

2           MR. SOLOMON:  They called them.  That's in

3    the notice, right?  But I don't know that, right?

4           I'm not seeing what that -- they didn't put

5    that in their letter.  That's the point.  They

6    didn't say, all these people called us.  They said,

7    oh, we're reaching out to them.  That's what they

8    said.  They're like, we're talking to people.  And I

9    could quote in there.  If you read it, it reads like

10   they're calling them, which was my concern.

11          Now, I found myself in a tough position,

12   right?  So I knew that there was a low return claim

13   rate --

14          THE COURT:  Right.

15          MR. SOLOMON:  -- and I knew that was an

16   issue.

17          They bring up this issue about releases,

18   which to me doesn't matter for two reasons.  One,

19   they had calculations previously.  Two, they knew

20   who the releases were for months.  So they didn't

21   look at the calculations when they billed it -- they

22   did on February 5th -- and catch anything.

23          Three, they didn't bring up -- well, four,

24   I should say.  They didn't bring up the issue to me

25   until after I brought up the issue to them, that

1    I -- the concern I have -- because if you look at

2    their billing records, I'm talking to them on the

3    26th.  The very next morning, they're figuring out

4    what was wrong and e-mailing me.

5         It also doesn't matter because the

6    releases, which could have been provided to the

7    settlement administrator by them, and which they

8    ultimately were, simply say that the people who are

9    entitled to more money, the biggest fish in the

10    pond, get more money, right?

11         THE COURT:  Right.

12         MR. SOLOMON:  So at the end of the day,

13    it's a neutral factor.  But now, I had a problem,

14    right?  And I thought back to *Deenora*.  I said to

15    myself, okay, there's a violation of an order.  Do I

16    come -- and I don't know how that's going to play

17    out.  I don't know if that's going to lead to the

18    fact that the claims are going to end up being below

19    average, above average, weird, not weird.

20         So I read -- I recalled cases I looked at

21    in the 216(b) violation.  It was like, okay, you

22    violated my order, but nothing bad happened, or

23    nothing happened yet.  So I didn't want to come to

24    court and raise that at the time because I didn't

25    know what was going to happen.

1          So what I had said to Mr. Kirschenbaum at
2     the time was, this is messed up.  You should have
3     called me.  I mean, I'm not going to do anything
4     about it right now because I don't know how it's
5     going to play out.  I understand you're trying to
6     get more people in.  That's great.  But bodies and
7     value are two different things.  Interest in the
8     class deals with how many people join, not the value
9     of their claim.  Attorneys' fees relates to value.
10          So, lo and behold, what ends up
11     happening -- and I apologize for going beyond the
12     word limit.  I think a lot of that was motivated
13     because we had to put the math in, right?
14          We saw something incredibly weird, for lack
15     of a better term.  8 percent of the class joins,
16     taking 23 percent of the money.  The average, even
17     though I didn't put it in my letter, of the people
18     who joined was -- and, Megan, correct me if I'm
19     wrong -- 3,840 out of people who joined after 6-30.
20          Previously, the total average, even if you
21     took out plaintiffs and the opt-in, right, so you're
22     taking away about seven people -- six opt-ins, one
23     plaintiff -- that was 1,449.50.  If you left them
24     in, it's 1,690.  So you're talking about double the
25     average of the settlement.  And that seems odd to me

1   because things that happen organically happen
2   organically; things that don't, don't.
3           And if you're -- these people magically
4   join, right, to make the fee high enough, to make
5   the return rate high enough to justify the fee so
6   your Honor doesn't cut it, right, that's odd to me.
7           And let me tell you something.  I have had
8   these cases where there's been a high return rate
9   organically.  I just had one where the return rate
10  was 95 percent organically.  Nothing weird happened.
11  And we didn't complain about that because nothing
12  weird happened.
13          THE COURT:  Can you just walk through those
14  statistics that you just gave me a moment ago?
15          MR. SOLOMON:  Sure.
16          THE COURT:  Just -- I'm not sure -- I want
17  to make sure I understand the percentages that you
18  were just giving me.
19          So the 8 percent represents what?
20          MR. SOLOMON:  Okay, let me walk through it,
21  totally.
22          THE COURT:  Sure.
23          MR. SOLOMON:  There were 275 class members.
24  You got that, right?
25          THE COURT:  Right.

1          MR. SOLOMON:  Seven individuals, one named

2    plaintiff, six opt-ins, right?

3          So if you figure the total net fund for all

4    those people was 200- and -- 465,000.  So if you

5    take away the claims of those --

6          THE COURT:  Sorry.  You have got to slow

7    way down for me --

8          MR. SOLOMON:  Sorry.

9          THE COURT:  -- because -- also, if you want

10   this transcribed --

11         MR. SOLOMON:  I get it.

12         THE COURT:  -- the court reporter has got

13   to be able to understand you.

14         MR. SOLOMON:  Sorry.

15         THE COURT:  So seven individual --

16         MR. SOLOMON:  Seven individuals.

17         THE COURT:  Seven individuals.  One of

18   those is named.  Six are opt-in.

19         MR. SOLOMON:  Right.  The total amount

20   allocated for the entire net fund was 465,000.  If

21   you take away their claims, right --

22         THE COURT:  "Their" being the seven --

23         MR. SOLOMON:  Seven people.

24         THE COURT:  Okay.

25         MR. SOLOMON:  You end up with 388,465.27.

1    Okay.  That is what is left over.

2            THE COURT:  465.27?

3            MR. SOLOMON:  .27.

4            We checked this math, Ms. Beloff and I, I

5    can say six, seven, eight times.

6            THE COURT:  Okay.

7            MR. SOLOMON:  We have a spreadsheet that's

8    color coded.

9            THE COURT:  Right.

10           MR. SOLOMON:  It's, you know ...

11           THE COURT:  Okay.

12           MR. SOLOMON:  Now --

13           THE COURT:  So the balance for the other

14   class members, aside from the seven, you're saying

15   is 388-.

16           MR. SOLOMON:  388,465.27.

17           THE COURT:  Okay.

18           MR. SOLOMON:  That's correct.

19           THE COURT:  Okay.  Next step.

20           MR. SOLOMON:  Okay, next step.

21           Now, if you took everybody who joined

22   before 6-30 -- and, by the way, we had suspicion to

23   believe they were calling before 6-30, but that's

24   how this all started.

25           THE COURT:  Okay.

1          MR. SOLOMON:  It was about on 6-25.  I'm

2     going to leave that alone.

3          THE COURT:  Okay.

4          MR. SOLOMON:  Everybody who joined,

5     including the opt-ins and named plaintiff --

6     including them, they were worth 195,812.47.

7          Now, if you took away the opt-ins and the

8     six -- sorry -- the named plaintiff and six opt-ins,

9     the total value of the claims was 119,278.65.

10          THE COURT:  Okay.

11          MR. SOLOMON:  Now, the total value of the

12     people who joined after, you know, June 30th was

13     92,166.19.  So --

14          THE COURT:  Sorry.  92-?

15          MR. SOLOMON:  92,166.19.

16          THE COURT:  All right.  Thank you.

17          MR. SOLOMON:  So that 388,465 was available

18     for 268 people, right?  275 minus 7.

19          THE COURT:  Okay.  How many people joined

20     after June 30th?

21          MR. SOLOMON:  24.

22          THE COURT:  Okay.

23          MR. SOLOMON:  So if you do the math, you

24     figure 24 is, what, about 8, 9 percent of about --

25     roughly, call it 9 percent.

1            THE COURT:  Of 275?

2            MR. SOLOMON:  Of 268.

3            THE COURT:  Okay.

4            MR. SOLOMON:  Because I'm looking at 268.

5    I'm taking away 7.  Okay.

6            And, you know, even -- you know, if you

7    start doing the math, you know, the percentage

8    becomes very high.

9            I did the -- I originally figured 25

10   percent by dividing it into 195, right?  I made a

11   mistake, and that's how I got to 23 percent.  If I

12   divided it into 119, it's almost 50 percent.

13           THE COURT:  Divided what into what?

14           MR. SOLOMON:  If I took 92.5 --

15           THE COURT:  Okay.

16           MR. SOLOMON:  -- and I divided it into, you

17   know, the available remainder, right, of 388-, that

18   is 23 percent.  You have 9 percent of the people

19   taking a quarter of the money.  And the average

20   return of their claims, the average value of their

21   claims was $3,840.

22           The average value of claims across the

23   board, if you include the seven -- the six opt-ins

24   and the named plaintiffs -- it was $1,690.91.  And

25   if you took them out, which is the number you need

1　to look at, it is 1,449.5.  To me, this --

2　　　　　　THE COURT:  You've lost me after 3,840.

3　　　　　　MR. SOLOMON:  Oh, I'm sorry.

4　　　　　　THE COURT:  I don't know who you're talking

5　about with 1,690.

6　　　　　　MR. SOLOMON:  All right.  So 1,690 is the

7　total average value of the claims of everyone in the

8　class, including the named plaintiff, including the

9　opt-ins.

10　　　　　　THE COURT:  Okay.

11　　　　　　MR. SOLOMON:  Total, across-the-board,

12　average value.  And I'm including alternative

13　minimum benefit because they exist.

14　　　　　　THE COURT:  Okay.

15　　　　　　MR. SOLOMON:  We can't leave them out,

16　right?

17　　　　　　THE COURT:  Right.

18　　　　　　MR. SOLOMON:  And they were available to be

19　called if plaintiff was calling people.

20　　　　　　THE COURT:  Right.

21　　　　　　MR. SOLOMON:  So if you take out those

22　seven individuals we've been talking about -- the

23　six opt-ins and the named plaintiff -- the average

24　you're left with for everyone else is $1,449.50.

25　　　　　　THE COURT:  Okay.

1          MR. SOLOMON:  So if you take your 3,840,

2    that's the average for everybody after 6-30, 24

3    people, and you're comparing it against either one

4    of those last two numbers I said, it's either more

5    than double or double.

6          THE COURT:  Okay.  But your client agreed

7    to pay a number regardless of how many people up to

8    275 joined.

9          MR. SOLOMON:  We have no issue paying the

10   number for the claims.

11         THE COURT:  Okay.

12         MR. SOLOMON:  We're not here to address the

13   claims.  The value of attorneys' fees under the

14   agreement is evaluated separately.

15         THE COURT:  Right.

16         MR. SOLOMON:  We've all agreed to that.

17         THE COURT:  So this only goes to what --

18         MR. SOLOMON:  Fees.

19         THE COURT:  -- they should get in fees.

20         MR. SOLOMON:  Right.

21         THE COURT:  Which isn't at --

22         MR. SOLOMON:  We are not here to touch the

23   claims.  These people joined however they joined.

24   Were they called?  Were they not called?  They

25   joined to get paid, okay?

1          THE COURT:  Okay.

2          MR. SOLOMON:  The question is, is whether

3    or not opposing counsel's fee is reasonable, whether

4    or not he comported himself in accordance with the

5    agreement or the law.

6          THE COURT:  So let's address the threshold

7    question that Mr. Kirschenbaum raised, which is you

8    agreed not to oppose their application for

9    attorneys' fees -- I forget the language, but

10   consistent with the settlement agreement, or

11   something to that effect.

12         MR. SOLOMON:  Well, the language matters.

13         THE COURT:  I know.  I just don't have it

14   in front of me.

15         MR. SOLOMON:  I'm sure --

16         THE COURT:  So how are you alleging that

17   your -- on what basis is your objection to their

18   attorneys' fees proper?

19         MR. SOLOMON:  Well, simple.  Like, if he

20   was calling people improperly, then the fees

21   incurred were not reasonable with respect to that,

22   right?

23         THE COURT:  So you're saying I just cut out

24   the fees for the phone calls.

25         MR. SOLOMON:  Well, in addition to

1   everything, probably, since 6-25.

2          Now, the agreement itself, there was a

3   process and an order, right, which opposing counsel

4   went around.  There were controls under 216(b) and

5   Rule 23, which opposing counsel went around.  Didn't

6   need to.  He could have called me.  I understood the

7   issue.  I even told him I understood the issue.  We

8   could have fixed it.

9          THE COURT:  Okay.

10         So I asked Mr. Kirschenbaum a number of

11  questions about, you know, who we spoke to and which

12  fell into which category of people who reached out

13  to them versus being one of the seven versus being

14  somebody else.

15         What information would you like to have or

16  do you think that I should have in evaluating the

17  reasonableness of the attorneys' fees?

18         If I were to, say, ask Mr. Kirschenbaum to

19  submit an affidavit with a chart attached of the 20

20  to 30 people that he spoke to, what information is

21  it you're saying that I need to have?

22         MR. SOLOMON:  Well, you know, let me just

23  start with the information I had.  What I was

24  looking at was the billing records, and all these

25  say is "Claims Administration."

1          THE COURT:  Right.

2          MR. SOLOMON:  I don't know what that means.

3    It's not like, oh -- because if you see other

4    aspects of the records they submitted for billing,

5    it was call with claimant, call to claimant; like

6    shades of that, right?  Call to plaintiff.  Like,

7    see, he's not doing that.  And that was, again,

8    weird to me.

9          So when I'm thinking about what I would

10   want to see, I am -- I will admit right now I am at

11   the mercy of plaintiff.  I don't know what they --

12   they're saying what -- they did what they did,

13   right?

14         THE COURT:  Well, I'm asking you to help me

15   think over this.

16         MR. SOLOMON:  That's what I'm trying to

17   figure out.

18         THE COURT:  So if we were to have a chart,

19   ask Mr. Kirschenbaum to submit a declaration with a

20   chart attached to it that listed the people, the

21   class members with whom he or anyone at his firm

22   spoke, indicated whether the individual was a named

23   plaintiff, was the named -- I mean, I think it's

24   obvious that they spoke to the named plaintiff.

25         MR. SOLOMON:  No, I know.

1          THE COURT:  So I don't think that's

2     controversial.  But an opt-in plaintiff, somebody

3     who contacted the firm or someone that they -- the

4     firm initiated contact with, and then indicated when

5     that person filed their claim, what they're getting,

6     what all -- I'm trying to picture this chart and

7     asking you to help me --

8          MR. SOLOMON:  Yeah, I know.  I want to lay

9     one factual point out.

10          Like, the first thing we heard was that one

11     of the opt-in plaintiffs was reaching out, but I

12     have two things.  I've got a copy -- a picture of a

13     text message with an opt-in plaintiff reaching out

14     to somebody whose phone number that opt-in plaintiff

15     apparently didn't have, according -- this was -- we

16     found out from an employee who didn't want anything

17     to do with the settlement.

18          THE COURT:  I see.

19          MR. SOLOMON:  Okay.

20          So, you know, and he was saying to our

21     client, well, how did she get my phone number?

22          At that point, I was concerned about

23     disclosure of the class list, which, if those phone

24     numbers were given to the opt-in plaintiffs, that's

25     a problem because the settlement agreement does not

1    provide for that, and the attorney-client

2    relationship does not provide for that.  So when

3    he's saying --

4              THE COURT:  I mean, they work together,

5    so --

6              MR. SOLOMON:  I know.  But when --

7              THE COURT:  -- it wouldn't surprise me if

8    people had each other's phone numbers.

9              MR. SOLOMON:  Right.  Right, but it's a lot

10   of telephone to have that many people start calling

11   them, right?  That's a lot of telephone for -- have

12   the opt-in plaintiffs reaching out to all these

13   people.

14             I mean, there's 268 people in the class

15   besides them.  I mean, do they really, the six of

16   them, have all those -- have contact information for

17   all those people, or even 24?

18             I mean, you're talking some people that

19   didn't work, you know, with them at the same time,

20   as far as I can tell, as I recall.

21             So it's a bit, you know -- and I'm not --

22   at that point, I left that issue alone, right?

23             THE COURT:  Right.

24             MR. SOLOMON:  I left that issue alone

25   because I have two things:  One, (indiscernible)

1   issue, possibly; and two, direct contact.

2           So what I'm interested in to know, right,

3   to evaluate this, is, one, right, when was the

4   contact, right?  Because we have got to start there:

5   Dates of the contact.

6           Two, who was the contact with, right?

7   Three, was the contact between -- is class counsel

8   saying that the opt-in plaintiff contacted a

9   particular person?  And if so, what was the

10  connection there?  Who was the opt-in plaintiff and

11  who did they call, right?

12          Or is class counsel saying they contacted

13  somebody directly?  Let's get the name.  Let's get

14  the date of that contact.  And if class counsel is

15  saying somebody called them, let's find out who and

16  when that happened.  I'm trying to come at it like a

17  spreadsheet, right?

18          Right.  Because it would be very

19  interesting for me to see how many people the opt-in

20  plaintiffs called because that would be either

21  interesting or not interesting, because when I'm

22  looking at the class list and I know when people

23  worked, I can easily figure that out.

24          Like somebody -- Victoria Sievers contacts

25  somebody else who worked there four years later or

1    earlier than Victoria Sievers.  I mean that just

2    gets weird.

3          MR. KIRSCHENBAUM:  Your Honor, can I

4    clarify one point?

5          THE COURT:  Yeah.  Just -- I'm going to

6    totally give you as much time as you want to

7    respond.  Well, not as much time as you want, but a

8    reasonable amount of time.  Okay.

9          All right.  Do you want a chance -- you

10   want to -- if I ask Mr. Kirschenbaum to provide us

11   with that declaration, I assume you want a chance to

12   respond to it.

13         MR. SOLOMON:  Yes.

14         THE COURT:  Okay.

15         MR. SOLOMON:  If we were to get a

16   declaration and a chart, I would like to respond to

17   it.

18         THE COURT:  Okay.

19         MR. SOLOMON:  I would like to go back

20   through it, take a look at the class list, take a

21   look at where people worked and see, you know, how

22   this shakes out.

23         THE COURT:  Okay.

24         MR. SOLOMON:  Did this happen organically

25   or didn't?

1          THE COURT:  Okay.

2          Go ahead, Mr. Kirschenbaum.

3          MR. KIRSCHENBAUM:  I just want to be clear

4     as to what happened.

5          THE COURT:  Sure.

6          MR. KIRSCHENBAUM:  And it might not be as

7     easy to assemble exactly like you're asking for

8     because I just want to be totally straightforward.

9     We did speak to the opt-in plaintiffs, the people

10    who opt-in for the case.  We did tell them, we think

11    it would be great if you got a lot of people to

12    opt-in.

13         THE COURT:  Okay.

14         MR. KIRSCHENBAUM:  But I don't want to

15    apologize for that behavior.  That is what we did.

16    That's what we always do.  And I -- it's what I

17    believe we're entitled to do.

18         I don't -- like, to the best of

19    Mr. Nussbaum's recollection, to the best of my

20    recollection, we did not actually speak to an absent

21    class member before -- definitely not after 6-30.

22    We don't think even before 6-30.

23         THE COURT:  Okay.

24         MR. KIRSCHENBAUM:  But, again, we certainly

25    did encourage people to claim the money they were

1    owed.

2              THE COURT:  Right.

3              MR. KIRSCHENBAUM:  And our client worked

4    there for many years, so it's not a surprise that --

5    the people she spoke with are the biggest claimants.

6    It's not a surprise that the biggest claimants are

7    the people who claimed.

8              THE COURT:  Right.

9              MR. KIRSCHENBAUM:  And the averages that

10   Mr. Solomon, you know, is claiming alternative

11   minimum benefit people -- like, of course, those

12   people bring the average down.  And those people

13   don't opt-in because --

14             THE COURT:  Right.

15             MR. KIRSCHENBAUM:  -- people don't sign

16   papers for $150.

17             THE COURT:  Well, how many do you -- do you

18   know offhand how many claimants are getting the

19   average minimum benefit as opposed to a straight-up

20   calculation?

21             MR. KIRSCHENBAUM:  Your Honor, very little.

22   I can tell you that.

23             THE COURT:  Just wait.

24             MR. SOLOMON:  Got it, Judge.

25             MR. NUSSBAUM:  Between 50 and 100, I

1  believe, but I can get the percentage.

2       MR. KIRSCHENBAUM:  No, no.  I think the

3  judge is asking how many of the claimants --

4       THE COURT:  How many of the actual

5  claimants are getting the alternative minimum versus

6  a formulaic number?

7       MR. NUSSBAUM:  I'm pretty sure it is very

8  little.

9       THE COURT:  Okay.

10      MR. NUSSBAUM:  I think it was three or

11 four --

12      THE COURT:  Okay.

13      MR. NUSSBAUM:  -- for minimum benefit.

14      THE COURT:  Okay.

15      MR. KIRSCHENBAUM:  And, like, 50 to 100 of

16 the claimants, of the 275, that were --

17      THE COURT:  Sure.

18      MR. KIRSCHENBAUM:  -- that were apportioned

19 the 150.

20      THE COURT:  Okay.

21      MR. KIRSCHENBAUM:  So, again, it makes

22 perfect sense.

23      THE COURT:  So what I'm contemplating,

24 Mr. Kirschenbaum, is having you provide me with a

25 declaration that has a chart attached to it that

1    indicates the 20 to 30, or however many it was,

2    individuals that your firm had contact with after

3    the notice was sent out, indicating when that

4    contact occurred, who it was with, who initiated it,

5    whether it was the individual or somebody from your

6    firm or an opt-in plaintiff, the date that their

7    claim -- that person filed a claim and the value of

8    their claim.

9         Is that doable?

10        MR. KIRSCHENBAUM:  Yeah.

11        THE COURT:  Okay.

12        MR. KIRSCHENBAUM:  Just to be clear, there

13   may be some level of specificity that we won't be

14   able to reach --

15        THE COURT:  You can explain it to me.

16        MR. KIRSCHENBAUM:  -- if that being the

17   case.

18        THE COURT:  Yeah.  Yeah.  Okay.  All right.

19        And then would you like -- I know I got

20   letters on this, but they were -- I know we put a

21   limitation on you, but would you like a chance to

22   submit, sort of, three pages on why it is what you

23   did, you think, is proper and doesn't change my

24   analysis with respect to the reasonableness of the

25   fees that you're seeking?

1          MR. KIRSCHENBAUM:  Sure.

2          THE COURT:  Okay.

3          MR. KIRSCHENBAUM:  Just, like, if I can

4     indulge, your Honor --

5          THE COURT:  Yeah.

6          MR. KIRSCHENBAUM:  -- maybe in a tiny drop

7     of guidance.

8          Like, is there -- what am I -- am I

9     addressing, like, the --

10         THE COURT:  Well, he thinks that what you

11    did is improper.

12         MR. KIRSCHENBAUM:  Yeah.

13         THE COURT:  Tell me why you think it's

14    perfectly fine.

15         MR. KIRSCHENBAUM:  Okay.

16         THE COURT:  And why you know specifically

17    in particular -- Judge Kogan's decision in *Panora* is

18    not 100 percent on point, but it has some aspect --

19    I don't think we're in sanctions land, but he does

20    allude to the fact that it may -- and I didn't look

21    at the docket in his case.  You have to see if he

22    actually did ultimately reduce attorneys' fees in

23    that case.  I don't know.

24         Mr. Solomon, you can tell me when you get

25    back up.

1          But just why -- I would like to understand

2     why what you did is proper and doesn't change my

3     determination with respect to the reasonableness of

4     the attorneys' fees that you're seeking.

5               MR. KIRSCHENBAUM:  Fair enough.

6               THE COURT:  Okay.

7               MR. KIRSCHENBAUM:  Just --

8               THE COURT:  Yes.  Go ahead.

9               MR. KIRSCHENBAUM:  No.  I am going to

10    resist the temptation --

11              MR. SOLOMON:  Okay.

12              MR. KIRSCHENBAUM:  -- to issue that Judge

13    Kogan decision on why --

14              THE COURT:  Totally.

15              MR. KIRSCHENBAUM:  -- because I am going to

16    do it in my --

17              THE COURT:  Okay.  You can do it then.

18    Yes.

19              Mr. Solomon?

20              MR. SOLOMON:  I'll start with *Panora*.

21              I can remember I was very prepared to give

22    a decent argument like I tried to do today --

23              THE COURT:  Yeah.

24              MR. SOLOMON:  -- on sanctions, and I got

25    two words out before Judge Kogan was -- expressed

1  his lack of happiness with opposing counsel.

2  THE COURT:  I understand.  Yes.  He has a

3  different way of expressing himself than I do,

4  so ...

5  MR. SOLOMON:  Yeah.

6  And at the end of the day, that case was

7  going to eve of trial.  We get a Rule 68.  Albeit a

8  bit sneaky, we did it on a defunct entity for the

9  other two, the named plaintiff and the actual

10  entity, or named defendant, and they accepted it,

11  absent fees, so it was like 100 grand fees on the

12  side.

13  So there was a lot of stuff that went into

14  that fee application, like the plaintiff billed for,

15  like, two hours for reviewing the magistrate judge's

16  rules.

17  THE COURT:  Right.

18  MR. SOLOMON:  Okay.  Except there was no

19  magistrate judge appointed.

20  THE COURT:  Right.

21  MR. SOLOMON:  So there was a lot of

22  weirdness there.  But at the end of the day, he did

23  impose the sanction.  He did give us attorneys' fees

24  at the time when that happened.  I think it was a

25  $2,000 sanction plus whatever we billed.

1          THE COURT:  Right.

2          MR. SOLOMON:  And then that's on the

3    docket.

4          What is an issue for me, though, because

5    I'm looking at a text message I got from my client

6    where you got Victoria reaching out to somebody

7    named Ronnie.  Hi, Ronnie.  This is Victoria.

8    Right?

9          So Victoria -- and apparently we found out

10   that Ronnie says he didn't -- Victoria doesn't have

11   his number.  I would like to know, was there any

12   disclosure of the class list, in addition to

13   anything, you know, they're going to say because,

14   like I said, you could have a $30,000 person,

15   another $30,000 person, and if they worked, you

16   know, three years apart, they never overlapped, and

17   they may not know anybody -- it's a bar, right?

18          I mean, I worked as a bartender.  Like,

19   things turn over, right?  I'm sure they know that,

20   right?  They do a lot of hospitality cases.  You may

21   really not know the person.  And the question,

22   therefore, is, how did you get the information,

23   right?

24          You would have to get -- Victoria would

25   have had to get Ronnie's number from somebody.  Who?

1    She get it from one person?  Somebody else?

2    Somebody else?  Somebody else?  I mean, what

3    happened?

4              THE COURT:  Okay.

5              MR. SOLOMON:  So I would like simply to

6    know --

7              THE COURT:  Why does that undermine -- I

8    don't think anybody's talking about the settlement

9    itself.

10             MR. SOLOMON:  No.  I --

11             THE COURT:  But why does that require some

12   additional or separate analysis on the --

13             MR. SOLOMON:  It doesn't.

14             THE COURT:  -- reasonableness of the

15   attorneys' fees?

16             MR. SOLOMON:  It doesn't.

17             THE COURT:  Okay.  Then why are we doing

18   this?

19             MR. SOLOMON:  It requires one sentence in

20   an affirmation:  I did not disclose the class list.

21             MR. KIRSCHENBAUM:  Your Honor, I am

22   standing right here.  I respectfully --

23             THE COURT:  As an officer of the court,

24   will you --

25             MR. SOLOMON:  Okay.  Then that's fine.

1          THE COURT:  Tell me that you did not

2    disclose the class list.

3          MR. KIRSCHENBAUM:  I did not disclose the

4    class list.

5          THE COURT:  Okay.

6          MR. SOLOMON:  Okay.

7          THE COURT:  There you go.

8          MR. SOLOMON:  I accept that, then.  That's

9    fine.  Everything else your Honor wants to do is

10   fine for me.  And I'm satisfied with that.

11         THE COURT:  Okay. All right.  Thank you.

12         Was there some other -- something else you

13   wanted to respond to?

14         MR. KIRSCHENBAUM:  I'm assuming that your

15   Honor knows that I have a response to that that I

16   have bottled up inside because you asked me for a

17   submission.

18         THE COURT:  You can, if you want to speak

19   your piece now.

20         MR. KIRSCHENBAUM:  Yeah.  Specifically, the

21   plaintiffs that have not opted in are not your

22   clients.  They have no rights affected by the case.

23         THE COURT:  Right.  Right.

24         MR. KIRSCHENBAUM:  They don't have a

25   relationship with you.  And the court says, this is

1    how you contact them.

2           Rule 23 plaintiffs, particularly in a

3    claims-made settlement, that are losing their

4    rights, they very much are clients --

5           THE COURT:  Right.

6           MR. KIRSCHENBAUM:  -- it is border

7    malpractice if I had a client's phone number and I

8    didn't just pick up the phone and say, hey, John

9    Doe, you have got money sitting there.  Sign this

10   piece of paper, fill it out, and get your money.

11          I understand that Mr. Solomon has made a

12   wonderful practice of settling cases for an amount

13   that jacks up the attorneys' fees, but the

14   plaintiffs collect very little, and that's a --

15          THE COURT:  Let's try to -- let's try

16   and -- try to cut down on the hyperbole.

17          MR. SOLOMON:  I'm going to leave that one

18   alone.

19          MR. KIRSCHENBAUM:  I'm not saying it

20   hyperbolically.  There is a practice that is

21   documented in the Southern District of New York with

22   an abundance of case law of unscrupulous plaintiffs'

23   lawyers who settle cases for a high amount so that

24   they can take a third as attorneys' fees, but there

25   is sort of an understanding that the claims rate

1  will be low enough that the defendant's lawyer can

2  tell his or her client at a mediation, don't worry,

3  you're only going to pay this and this amount.

4          And quite possibly, using those statistics,

5  Mr. Solomon could have given his client very good

6  advice about what he could expect to pay.  Sometimes

7  that doesn't work out well.

8          But a plaintiffs' lawyer has every right

9  and possibly obligation to do the best he can to

10  make sure that the people whose rights are being

11  released -- again, my fee would have been the same

12  no matter what.

13          Or I could have made this application

14  without opposition from Mr. Solomon if I had just --

15  if I had done nothing and let this money go away,

16  but that's not how we roll at my firm --

17          THE COURT:  Right.

18          MR. KIRSCHENBAUM:  -- because we like our

19  clients to get their money.

20          THE COURT:  Right.

21          MR. SOLOMON:  Can I just briefly respond,

22  Judge?

23          THE COURT:  Yes.  Yeah.

24          MR. SOLOMON:  I'm going to leave the

25  *ad hominem* attacks alone.

1          THE COURT:  I'm ignoring them, yes, from

2     both of you.

3          MR. KIRSCHENBAUM:  For the record --

4          THE COURT:  From both of you.

5          MR. KIRSCHENBAUM:  -- I didn't mean

6     anything *ad hominem*.

7          MR. SOLOMON:  What I will say -- because I

8     was a plaintiffs' lawyer, too.  I handled these

9     cases, too.  And I understand the point that

10    Congress wants people who have little claims to get

11    paid.  But when you sit there and you're going to

12    worry about people whose rights are going to get

13    waived, the little fish matter as much as the big

14    fish.

15         THE COURT:  Okay.  All right.

16         So I have a few findings that I want to

17    make.  We are not, unfortunately, going to be able

18    to enter the final order and judgment because of

19    these supplemental submissions, but I want to

20    accomplish today as much as we can.

21         So having considered the settlement

22    agreement and all of the parties' submissions, the

23    Court has conducted an inquiry pursuant to section

24    § 216(b) of the Fair Labor Standards Act, as well as

25    Rule 23 of the Federal Rules of Civil Procedure, and

1    I find and order as follows:

2          That I will use capitalized terms in my

3    statement now and going forward, and those terms

4    have the same meaning as defined in the settlement

5    agreement.

6          The Court does have jurisdiction over the

7    subject matter of this action, the named plaintiff,

8    the opt-in plaintiffs, the class members, as well as

9    defendants, 310 Bowery Group LLC, doing business as

10   310 Bowery Bar and Epstein's Bar LLC doing business

11   as 82 Stanton Bar and Richard Aurigemma.

12         The Court finds that the settlement was the

13   product of arm's-length negotiation between

14   experienced counsel, and the Court will grant final

15   approval of the settlement, including the releases

16   and all other terms as fair, reasonable and adequate

17   to the parties and the class members.

18         And, henceforth, the settling parties, as

19   defined in the agreement, are directed to perform

20   the obligations that they have in accordance with

21   the terms set forth in the settlement agreement.

22         The Court also finds for settlement

23   purposes only that the New York Labor Law Class, the

24   NYLL Class, satisfies the applicable standard for

25   certification under Federal Rule of Civil Procedure

1 23 and that the FLSA Class satisfies the applicable

2 standard for collective certification under

3 29 U.S.C. 216(b).

4          The Court also finds that the procedures

5 for notifying the class members about the

6 settlement, including the class notice and related

7 documents, constituted the best notice practicable

8 under the circumstances to all class members and

9 that that notice fully satisfied all the

10 requirements of due process.

11          Based on the evidence and the other

12 materials submitted to the Court, the class notice

13 and the class members were -- the class notice sent

14 to the class members provided adequate, due,

15 sufficient and valid notice.

16          The Court approves the service award of

17 $10,000 for named plaintiff, Gina Marin, to

18 reimburse her for her unique services initiating and

19 maintaining this litigation.

20          The Court will award the claims

21 administrator its reasonable costs in administering

22 the settlement, subject to class counsel's review of

23 the claims administrator's invoices, to be paid out

24 of the settlement funds.

25          And, ultimately, the Court will reserve

1   jurisdiction, continuing an exclusive jurisdiction

2   over the parties to the settlement agreement to

3   continue to supervise, construe and enforce the

4   agreement in accordance with its terms.

5         The Court is reserving findings on class

6   counsel's request for attorneys' fees and litigation

7   costs and expenses in light of the supplemental

8   submissions that we are going to ask of the parties.

9   And those submissions are as follows:

10         We are asking for class counsel,

11   specifically Mr. Kirschenbaum, to submit a

12   declaration that provides the name of any class

13   members, aside from the named plaintiff, Ms. Marin,

14   and to provide, with respect to each of those

15   persons, when they were contacted, with whom that

16   class member had contact, who initiated the contact,

17   the date that that individual filed their claim

18   form, and the value of their claim.

19         And in addition to that, plaintiffs may

20   submit a supplemental, three-page letter brief --

21   and we will give you the equivalent word count of

22   three pages -- regarding the reasonable -- the

23   contact that is described in Mr. Kirschenbaum's

24   declaration and why that contact was proper and

25   appropriate and its impact, if any, on the

1  reasonableness of the class counsel's request for
2  attorneys' fees.
3        And then, correspondingly, defendants may
4  have equivalent of three pages of a letter brief to
5  respond to the submission.
6        So the next question that I have,
7  Mr. Kirschenbaum, is, for the declaration and the
8  supplemental letter brief, how long would you like
9  to do that?
10        MR. KIRSCHENBAUM:  So a week.  Ten days or
11  a week?
12        THE COURT:  Yep.  Just --
13        MR. KIRSCHENBAUM:  Also, Mr. Nussbaum was
14  sort of point guard, so if he could -- how can I --
15        THE COURT:  Either one of you.  I meant
16  your firm.  You had been doing most of the talking,
17  but -- so if we said the -- today is the 17th.  If
18  we said July 28th, is that sufficient?
19        MR. KIRSCHENBAUM:  It is.
20        THE COURT:  Okay.
21        And, Mr. Solomon, how long would you like
22  to respond?
23        MR. SOLOMON:  In light of a -- I'm going
24  away, so I was hoping the week after the 15th.  If
25  they need more time to do it, that is okay with me.

1          THE COURT:  Okay.

2          MR. NUSSBAUM:  So we will do it in a week,

3     and he can get it in a week.

4          MR. KIRSCHENBAUM:  Here, we will do it

5     faster, your Honor.

6          MR. NUSSBAUM:  Yeah.

7          MR. KIRSCHENBAUM:  Seriously.

8          THE COURT:  Okay.  Yeah, I know.  I don't

9     want to -- I didn't want to hold up the settlement

10    agreement, but --

11         MR. KIRSCHENBAUM:  Oh, we will get the --

12    our submission early next week.

13         THE COURT:  Okay.  How about the 22nd?

14         MR. KIRSCHENBAUM:  What day of the week is

15    that?

16         THE COURT:  That's a Tuesday.

17         MR. KIRSCHENBAUM:  How about the 23rd?  Is

18    that --

19         THE COURT:  The 23rd?

20         MR. KIRSCHENBAUM:  Yeah.

21         THE COURT:  Okay.

22         So if they put it in on the 23rd,

23    Mr. Solomon, when would you be able to respond?

24         MR. SOLOMON:  What are we thinking?  31st?

25         THE COURT:  Okay.  Great.  All right.

1          So Mr. --

2          MR. SOLOMON:  Before I go.

3          THE COURT:  Okay.  Great.

4          Mr. Kirschenbaum, anything else you would

5    like to cover or raise today?

6          MR. KIRSCHENBAUM:  No.  Thank you very

7    much, your Honor.

8          THE COURT:  Okay.  Thank you.

9          Mr. Solomon?

10          MR. SOLOMON:  No.  Thank you, your Honor.

11          THE COURT:  All right.

12          Thank you, all.  We will look forward to

13   the supplemental submissions and trying to get this

14   finalized as soon as possible.  Thank you very much.

15   Have a good afternoon.

16          MR. SOLOMON:  Have a good one.  Thank you,

17   your Honor.

18          THE COURT:  Thank you.

19

20

21

22

23

24

25

1

2

3                        C E R T I F I C A T E

4

5          I, Adrienne M. Mignano, certify that the

6     foregoing transcript of proceedings in the case of

7     Marin v. 310 Bowery Group LLC, et al.,

8     Docket #24CV1340 was prepared using digital

9     transcription software and is a true and accurate

10    record of the proceedings.

11

12

13    Signature  _____

14                 ADRIENNE M. MIGNANO, RPR

15

16    Date:      July 21, 2025

17

18

19

20

21

22

23

24

25



EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

JOSE PANORA, on his own behalf and on behalf        :
of others similarly situated,                                       :
                                                                              :
                                        Plaintiff,               :         **MEMORANDUM DECISION**
                                                                              :         **AND ORDER**
                - against -                                           :
                                                                              :         19-cv-7267 (BMC)
DEENORA CORP d/b/a Dee's *et al*.,                    :
                                                                              :
                                        Defendants.            :

------------------------------------------------------------- X

**COGAN**, District Judge.

        In this wage case under the Fair Labor Standards Act ("FLSA") and corresponding state

law, plaintiff obtained a $100,000 judgment against defendant Deenora Corp d/b/a Dee's

pursuant to Fed. R. Civ. P. 68(a).  The judgment deferred an award of attorneys' fees pending

discussions between the attorneys or a motion to recover them.  The discussions having failed,

plaintiff, through his counsel ("Troy Law"), has moved for attorneys' fees of $53,375.05 and

costs of $1,192.36.  Defendants contend that plaintiff should recover nothing at all or, at most, a

sharply reduced amount in the discretion of the Court.  The Court grants plaintiff's motion but

reduces the amount of the attorneys' fee award as described below.

## BACKGROUND

        Familiarity with the detailed facts of this highly contentious case is presumed, see

Panora v. Deenora Corp, 521 F. Supp. 3d 177 (E.D.N.Y. 2021), but the basic facts can be

summarized as follows.

        Defendant Dee's Brick Oven Pizza is what its name implies.  It employs waiters,

bartenders, bussers, and kitchen staff.  Plaintiff worked there from about January 1995, starting

as a dishwasher and then a "salad person."  At some point in the early 2000s, he was promoted to

Chef, a position he held through July 13, 2019.  When promoted, he received a flat weekly salary of $1,310 per week; that increased to $1,400 per week in April 2018.

Plaintiff asserted that he worked about 67.5 hours every week and always more than eight hours each day but received no extra pay for the hours over 40.  Defendants responded that this was because plaintiff was an executive or manger, and thus exempt from coverage under both the FLSA and New York Labor Law.  See 29 U.S.C. § 213(a)(1); N.Y. Labor Law § 651(5).  I denied defendants' motion for summary judgment on this point, finding there were many issues of fact as to the duties plaintiff performed and the responsibilities he had and thus I could not determine as a matter of law whether he fell within the exemption.  See Panora v. Deenora Corp., 467 F. Supp. 3d 38, 41-44 (E.D.N.Y. 2020).

Plaintiff's complaint sought the usual panoply of redress in wage actions: accrued but unpaid overtime and minimum wages; liquidated damages; pre-judgment interest, spread-of-hours pay; and $10,000 for violating New York notice requirements to employees.  See N.Y. Labor Law §§ 195(1)(a) & (3), 198(1-b) & (1-d).

As to failing to pay him a minimum wage, plaintiff's theory was that he had received no payment at all for his overtime hours.  That meant that each of those overtime hours had a basis of zero and zero is of course less than the minimum wage.  I rejected that argument in granting defendants' motion to dismiss plaintiff's minimum wage claim, noting that "this theory would hold that a non-exempt employee paid $1 million dollars per week would still have a viable minimum wage claim upon working his 41st hour."  Panora, 467 F. Supp. 3d at 45.

Subsequently, plaintiff moved for conditional approval to proceed as a collective action and to send out notices to other employees.  Defendants opposed and sought sanctions, but I

granted the motion and gave detailed instructions on the form of the notice.  See Panora v. Deenora Corp., No. 19-cv-7267, 2020 WL 7246439 (E.D.N.Y. Dec. 9, 2020).

Troy Law then unilaterally altered the court-approved notices in several ways to make opting in more likely without advising the Court or defendants that it had done so.  I granted defendants' motion for sanctions in the amount of $2,000 against Troy Law with an additional direction to reimburse defendants' reasonable attorneys' fees in making the motion for sanctions (together, the "Notice Sanctions"), but I denied defendants' motion to retract the prior approval for sending notices to the collective.  See Panora, 521 F. Supp. 3d 177.  Plaintiff moved for reconsideration which I denied by docket entry.  Plaintiff then delayed paying the sanctions for a week after his reconsideration motion was denied.  This led to another motion by defendants for further sanctions, which I denied.

Despite the extensive litigation over the motion to permit collective action notice and the subsequent sanctions, none of defendants' employees opted into the case.

The alteration of the notice was not the only time in this case that I had to impose sanctions.  I required Troy Law to reimburse defendants' reasonable attorneys' fees for their moving brief on another sanctions motion, and I sanctioned each side's lawyers $350 for attempting to litigate the issue of who was responsible for delivering courtesy copies of motion papers to Chambers.

Plaintiff filed a notice of acceptance of defendants' $100,000 offer of judgment shortly before trial.  The offer preserved plaintiff's right to move for attorneys' fees.  That is the motion before the Court.

## DISCUSSION

It is undisputed that since plaintiff obtained a $100,000 judgment against defendants, he is entitled to move for attorneys' fees under both the FLSA and New York law. See 29 U.S.C. § 216(b); N.Y. Labor Law §§ 198(1–a) & 663(1).

Courts within the Second Circuit generally employ the "presumptively reasonable fee" method when analyzing attorneys' fees motions. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany & Albany County Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2008). Under this method, courts multiply the "amount of time reasonably spent by counsel" by a reasonable hourly rate to derive a presumptively reasonable overall fee. Cover v. Potter, No. 05-cv-7039, 2008 WL 4093043, at *5 (S.D.N.Y. Aug. 29, 2008). To determine reasonable hourly rates, courts must refer to the "prevailing [market rates] in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984). The "community" is the district where the district court sits. See Simmons v. New York City Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009); Arbor Hill, 522 F.3d at 190.

Here, the $53,705.50 that plaintiff seeks is based primarily on a claimed $450 per hour rate for plaintiff's lead attorney, John Troy, and $300 per hour for a mid-level associate, Aaron Schweitzer. There is also one junior attorney and two paralegals who are charged out at $100 to $200 per hour.[1] However, the amount claimed is net of adjustments to the number of hours charged. Troy Law has eliminated time spent by all attorneys and staff on the Notice Sanctions (eliminating over 43 hours) and reduced all attorney rates to $150 for work that Mr. Troy thinks could fairly have been assigned to a paralegal.

---

[1] Plaintiff is not seeking fees for the work of two other junior attorneys.

Defendants oppose the motion on numerous grounds.

### 1.   Excessive litigiousness

Defendants' main argument is that plaintiff overlitigated the case.  They point to the dismissed minimum wage claim, plaintiff's refusal to discuss settlement, discovery violations, and the Notice Sanctions.

Defendants' argument has an element of the pot calling the kettle black.  The fact is that this case was hard-fought on both sides, and defendants gave as good as they got.  If I was going to find overlitigation, defendants would be nearly as responsible for it as plaintiff.  The vitriol in their opposition to the instant motion, especially the request to disallow fees in their entirety despite obtaining a wage award of $100,000 for Troy Law's client, is a good illustration of it, but far from the only one.  Opposing plaintiff's motion for collective action authorization despite the minimal standard necessary to obtain that relief; seeking summary judgment on the executive exemption issue despite clear issues of disputed fact; asking for the primary relief in the Notice Sanctions of revoking authorization for collective notification (even though this wouldn't hurt plaintiff at all but would only harm any co-employees who might want to opt-in); seeking additional sanctions because plaintiff didn't pay the Notice Sanctions until a week after his motion for reconsideration of them was denied; requesting other sanctions at least twice and having those denied; initiating motion practice over the delivery of courtesy copies; making an "emergency" motion because of an obvious error in the original judgment; and moving to strike an exhibit in connection with the instant fee motion instead of just addressing why defendants thought it is immaterial (it is), could all be considered to have been overlitigation.  The fact is that both sides were responsible for a substantial amount of motion practice in the case that

didn't have to occur.  If Troy Law is more responsible than defendants' lawyers, it is only marginally so.

As a practical matter, counsel for a defendant who has any kind of liability exposure in an FLSA or NYLL case has to be more careful with what he files than the plaintiff's lawyers.  The plaintiff's lawyers need only comply with the standard of good faith.  The defendants' counsel must meet not only that, but because a recovery in favor of a plaintiff carries with it the right to seek attorneys' fees, the defendants' counsel must be constantly aware that if he makes an unsuccessful motion, even in good faith – and, indeed, even if he makes a successful but non-dispositive motion – his client may be incurring an additional exposure for the attorneys' fees that plaintiff has expended in responding to defendants' arguments.  Defense counsel should therefore be convinced that his filings not only are in good faith, but that he believes those arguments have a high likelihood of prevailing on the motion or in the case.  The number of motions and arguments by defendants that I denied or rejected suggests that either this factor was not always considered or that defendants' counsel misperceived the chances of prevailing on a number of them.

## 2.  Pursuit of minimum wage claim

Defendant criticizes plaintiff's decision to litigate the minimum wage claim, focusing on my advice to Troy Law at the premotion conference that it seemed unlikely to succeed.  It didn't succeed, but it didn't violate Rule 11 either.  Plaintiff's theory was not based on the FLSA but on New York law.  Troy Law read Section 146-3.5(b), Title 12, of the New York Code, Rules and Regulations too aggressively, but courts should not sanction lawyers merely for trying to stretch the reach of a statute.  I referred to this theory as "creative" when I rejected it, which admittedly had a partially (but only partially) pejorative subtext, but if I thought it was frivolous, I would

have said so.  Panora, 467 F. Supp. 3d at 45.  It is important not to chill plaintiffs' lawyers from advancing novel arguments as long as those arguments are not frivolous.

### 3.    Failure to negotiate

Defendants also criticize plaintiff's counsel for refusing to discuss settlement except through a demand for $1,163,995.83 based on a calculation that defendants assert was "astronomical."  They have exhibited the spreadsheet that Troy Law provided to them to support plaintiff's demand.  Defendants, however, do not explain to me why the amount claimed is astronomical.  It is not really a settlement demand; it is a maximum recovery scenario.  It seems like all that plaintiff did was total up the amount of damages for each element, *i.e.*, unpaid overtime, liquidated damages, interest, and the other elements demanded in the complaint.  The only potential overreach immediately apparent is the inclusion of damages based on plaintiff's minimum wage theory, which the Court had not at that point rejected, and, arguably, the inclusion of interest, which some cases hold is not recoverable when liquidated damages are awarded.  See Yun Hong Hua v. Eight Star Inc., No. 15-cv-0275, 2015 WL 2354322, at *3 (E.D.N.Y. May 15, 2015).  The fact is that the federal and state (mostly state) wage laws can impose a crippling or fatal level of damages on a small business for non-compliance – indeed, they are designed to have a deterrent effect – and these cases almost always settle because the risks to the business (and often its principals' personal assets) are so high.

Assuming, arguendo, that plaintiff did decline to reasonably negotiate, there is no provision in federal practice that requires a party to engage in settlement discussions unless the court orders it.  It is an often-used hardball strategy to take a no-settlement or high settlement position until the eve of trial to pressure a defendant to make its best offer.  It appears to have at least partially paid off for plaintiff here.

Defendants complain that they made two Rule 68(a) offers for $35,000 each that plaintiff rejected and because the accrued fees were much lower at those points, plaintiff refused in bad faith to accept the offers solely for the purpose of increasing the attorneys' fees with more litigation. The facts actually suggest the opposite. Instead of accepting a $35,000 offer, plaintiff's attorney got his client $100,000. Attorneys' fees will be in addition to that amount as determined by the decision on this motion, so plaintiff has not been hurt by the extra litigation. Therefore, there is no basis for counsel's claim that the earlier Rule 68(a) offers show that the additional litigation was unnecessary. The accepted Rule 68(a) offer nearly tripled the amount that defendant originally offered.[2]

Defendants place particular emphasis on a text exchange between John Troy and one of defendants' lawyers. In that exchange, Mr. Troy stated:

> [I]t seems you enjoy your Deenora case a lot[.] Clients come and go [but] we, attorneys, have to survive[.] I am shaking the Apple tree so you could pick up the fallen apple on the floor[.] I am the rainmaker for you[.] [Y]ou make more money on this case than the last one[.] You should say thank you and have a good weekend[.] Maybe you do not have to say thank you, but do not hit me with a bat[.] [H]a ha[.]

The text message is foolish and undignified. But it does not show Mr. Troy "admitted" to overlitigating the case, as defendants argue. The text doesn't say anything about the amount of work plaintiff has done, and, indeed, the statement "do not hit me with a bat" suggests that it was defendants, not plaintiff, who were engaging in unnecessary

---

[2] Defendants also arguably violated the New York Rules of Professional Conduct. Defendants' counsel had doubts as to whether plaintiff's counsel had actually forwarded the $35,000 offers to plaintiff. He therefore advised his client to send the offer directly to plaintiff, which his client did. Although a client can decide on its own whether to directly contact his adversary, a lawyer cannot advise a client to contact his adversary, or do anything that the attorney could not do directly. See ABA Formal Opinion 11-461. It is of course improper for a lawyer to contact a represented adversary, and thus since he can't do it himself, he can't put up his client to do it for him either.

litigation.  And the text might well have served the legitimate purpose of reminding

defense counsel of their clients' vulnerability to having to pay both sides' attorneys' fees.

Defendants nevertheless contend that plaintiff's counsel obtained a poor result for

plaintiff.  They contrast the $100,000 judgment with the approximately $1.2 million maximum

recovery scenario referenced above.  Their point seems to be that such a deep discount from their

maximum recovery scenario means that the refusal to negotiate was in bad faith.

However, defendants are in no position to complain about the discount they received

while, at the same time, baldly proclaiming that their financial distress prevents them from

settling in excess of the amount they offered.  Although defendants have not shown this Court

any evidence of their potential inability to pay a judgment, it was not unreasonable for plaintiff's

counsel to take those protestations of poverty into account in advising his client to accept

$100,000.  In addition, I have never seen a wage case settle for an amount that includes

liquidated damages or prejudgment interest, and right there, that knocks down plaintiff's $1.2

million maximum recovery scenario by nearly $350,000.

In any event, plaintiff ultimately settled for less than 1/10 of his maximum possible

recovery, and defendants settled for just under three times their initial settlement offer.  Those

facts in isolation do not persuade me that the recovery here was negligible.  The settlement may

be small in relation to plaintiff's maximum potential recovery, but $100,000 is well above the

average for a single plaintiff wage case against a small business in this district.  At the very least,

although the recovery was not a home run, it was not, as defendants contend, "subpar."

Finally (as to this point), defendants contend that because they "generously offered"

$12,500 to settle the attorneys' fee issue, plaintiff's rejection of that offer and pursuit of this

motion are further indicia of bad faith.  The award set forth below shows that defendants' argument is wrong.

### 4.  Previously sanctioned misconduct in this case

Defendants also assert that because plaintiff's counsel engaged in a discovery dispute that resulted in sanctions as well as causing the Notice Sanctions, counsel's claimed fee should be cut or reduced to zero.  However, the Court has already been there and done that.  A further reduction in the fee award for that reason would be doubling up.  It is true that the Court, in imposing sanctions, warned plaintiff that the amount of fees claimed might be cut because of counsel's conduct in addition to the Notice Sanctions.  But by voluntarily giving up the fees that might have been claimed relating to the Notice Sanctions, plaintiff's counsel has already applied the remedy that the Court might have imposed.

### 5.  Previously sanctioned misconduct or bad practice in other cases

A substantial part of defendants' opposition to the fee motion is to note the many cases in which Troy Law has had its fees cut, sanctions imposed, class counsel motions denied, collectives decertified, or other criticisms of its performance.[3]  It is accurate to note that Troy

---

[3] See, e.g., Jin v. Shanghai Original, Inc., 990 F.3d 251, 263 (2d Cir. 2021) (finding that the "district court acted within its discretion in decertifying the class on the ground that class counsel [Troy Law] was no longer adequately representing the class"); Lin v. Quality Woods, Inc., No. 17-cv-3043, 2021 WL 2343179, at *8 (E.D.N.Y. June 4, 2021) (directing Troy Law to show cause why sanctions should not be imposed for, among other conduct, "doubling down on bad faith assertions"); Shi Ming Chen v. Hunan Manor Enter., Inc., No. 17-cv-802, 2021 WL 2282642, at *8 (S.D.N.Y. June 4, 2021) (denying plaintiff's motion for Rule 23 class certification as "[g]iven the litigation history of Troy and Troy Law in this Circuit as well as conduct throughout the present litigation, we cannot find Troy or Troy Law will serve as adequate class counsel"); Rodpracha v. Pongsri Thai Rest. Corp., No. 14-cv-02451, 2021 WL 1733515, at *2 (S.D.N.Y. Mar. 22, 2021) (finding Troy Law inadequate to represent the putative class and noting that the Court "shares the broader concern that has been expressed by other judges, in this district and elsewhere, that, regardless of its professed level of experience in wage-and-hour cases, Troy Law has shown a tendency towards prejudicial neglect of its clients' interests"); Yi Mei Ke v. J R Sushi 2 Inc., No. 19-cv-7332, 2021 WL 965037, at *3 (S.D.N.Y. Mar. 15, 2021) (in sanctioning Troy Law, noting that "[s]omething more than a written admonishment is required, however, both to deter repetition of the misconduct and to protect Troy Law's potential future clients"); Bao Guo Zhang v. Shun Lee Palace Rest., Inc., No. 17-cv-00840, 2021 WL 634717, at *18 (S.D.N.Y. Feb. 16, 2021) (ordering Troy Law to show cause why it should not be sanctioned for its "assertion and continuation of meritless claims," including its objections to the settlements of plaintiffs it does not represent); Ji Li v. New Ichiro Sushi, Inc., No. 14-cv-10242, 2020 WL 2094095, at *10, 12 (S.D.N.Y. Apr. 30, 2020) (issuing sanctions where the Court found that Troy Law's continued pursuit of "entirely meritless" claims were "in bad faith"

Law has attracted a troublingly high number of reprimands and adverse consequences due to its poor practice.

Troy Law's tarnished history compels the Court to scrutinize its fee applications in this or any other case with special care.  It also makes more egregious any repetition of the same criticism that Troy Law has received in other cases.  Nevertheless, as noted above, when plaintiff's law firm committed sanctionable conduct in this case, the Court imposed sanctions. Aside from that extra level of scrutiny, the fee application here has to be decided primarily by the

---

and "improper[]");Yuajian Lin v. La Vie En Schezuan Rest. Corp., No. 15-cv-9507, 2020 WL 1819941 (S.D.N.Y. Apr. 9, 2020) (reducing Mr. Troy's hourly rate due to performance issues and noting that courts have reduced Mr. Troy's requested rate a number of times "where Troy's performance at trial demonstrated a lack of skill and/or professionalism."); Guangqing Lin v. Teng Fei Rest. Grp. Inc., No. 17-cv-17742020, WL 264407, at *3 (S.D.N.Y. Jan. 17, 2020) (sanctioning Troy Law and attorney Schweitzer for repeated "noncompliance with court-ordered deadlines"); Shiqiu Chen v. H.B. Rest. Grp., Inc., No. 16-cv-2005, 2020 WL 115279, at *12 n.20 (S.D.N.Y. Jan. 9, 2020) (observing this was "yet another instance in which ... Troy Law PLLC has submitted conflicting sworn testimony" and that "[t]his course of conduct raises concerns about counsel's diligence in meeting ethical obligations to sufficiently investigate matters before they are filed and to guard against and take appropriate action with respect to submission of false testimony") (punctuation omitted); Jianjun Chen v. 2425 Broadway Chao Rest., LLC, 331 F.R.D. 568, 575 (S.D.N.Y. 2019) (imposing sanctions for discovery violations against Mr. Troy); Yu Zhang v. Sabrina USA Inc., No. 18-cv-12332, 2019 WL 6724351, at *3 (S.D.N.Y. Dec. 10, 2019) (noting concerns about "discrepancies regarding key facts that would be difficult to classify as a mere mistake" and that other "evidence in the record further raises questions whether Plaintiff submitted his affidavits in bad faith"); Ruixuan Cui v. E. Palace One, Inc., No. 17-cv-6713, 2019 WL 4573226, at *4, *6 (S.D.N.Y. Sept. 20, 2019) (reciting accusations from defendants that the plaintiff baselessly brought wage-and-hour claims against unrelated defendants, including that he "merely brought claims against individuals whose 'names somehow appear in public records of numerous dissolved corporations'"); Chun Lan Guan v. Long Island Bus. Inst., Inc., No. 15-cv-2215, 2019 WL 3807455, at *1 (E.D.N.Y. Aug. 13, 2019) (upholding monetary sanctions where Troy Law "failed three times to submit a draft joint pretrial order ('JPTO') to Defendants' counsel that complied with this Court's individual rules, in accordance with the deadlines set by Magistrate Judge Scanlon"); Shanfa Li v. Chinatown Take-Out Inc., No. 16-cv-7787, 2019 WL 3715086, at *6 (S.D.N.Y. Aug. 7, 2019) (reducing Mr. Troy's fee from his requested rate to $300 an hour where he "repeatedly interrupted the Court, was disrespectful, and struggled to pose clear questions"); Feng Lin v. Quality Woods, Inc., No. 17-cv-3043, at *3-6 (E.D.N.Y. Jan. 28, 2019) (finding that service was not properly made on all defendants and observing that "[t]his is not the first time th[e] Court has raised serious questions about the submissions made by Troy"); Jianshe Guo v. A Canaan Sushi Inc., No. 18-cv-4147, 2019 WL 1507900, at *4 (S.D.N.Y. Apr. 5, 2019) (dismissing case for failure to prosecute and assessing a monetary sanction because Troy Law and attorney Schweitzer "repeatedly failed to comply with this Court's deadlines, despite extensive experience with this Court and in this District"); Jianman Jin v. Shanghai Original, Inc., No. 16-cv-5633, 2018 WL 1597389, at *15 (E.D.N.Y. Apr. 2, 2018) (finding "concerning" discrepancy between the plaintiff's sworn affidavit and subsequent deposition testimony); Hui Luo v. L & S Acupuncture, P.C., No. 14-cv-1003, 2015 WL 1954468, at *2 (E.D.N.Y. Apr. 29, 2015) (noting that court could not justify a rate for Troy in excess of $300 per hour, where "[t]he trial was very rough in terms of demonstrating Mr. Troy's ability to formulate questions according to the rules of evidence").

history of this one case. It would be unfair to reduce the fees in this case for bad practices in other cases in which those courts have already taken the action they deem appropriate.

### 6. Hourly rates

Defendants contend that the hourly rates charged by each of the timekeepers in the Troy Law Firm are too high for a number of reasons.

First, they contend that the authorities on which plaintiff's counsel relies are in the default judgment context, and that context is not transferable to a fully litigated case like this one. The Court agrees in part. When a defendant fails to appear in an FLSA or other fee-shifting case, it naturally follows that a lower degree of scrutiny will be applied to the plaintiff's fee application as it is not the Court's role to act as counsel for the defaulting defendant. Cf. Greathouse v. JHS Sec. Inc., 784 F.3d 105, 119 (2d Cir. 2015) (Korman, J., concurring in part) ("There is something wrong when a case or controversy, to the extent that it exists, is principally between a plaintiff and the judges deciding the case."). In addition, most cases in the default judgment context seek well under $10,000 in attorneys' fees because it doesn't take that many hours to obtain a default judgment. See, e.g., Thompson v. Hyun Suk Park, No. 18-cv-0006, 2020 WL 5822455, at *11 (E.D.N.Y. Sept. 1, 2020) (seeking $7,425 in fees); Baizan Guerrero v. 79th St. Gourmet & Deli Inc., No. 18-cv-04761, 2019 WL 4889591, at *11 (E.D.N.Y. Sept. 10, 2019) (seeking $2,025 in fees); Leon v. Zita Chen, No. 16-cv-480, 2017 WL 1184149, at *10 (E.D.N.Y. Mar. 29, 2017) (seeking $5,063.05 in fees).

But defendants again overstate their argument. The rates for FLSA cases will be reduced, even in the default judgment context, if they are clearly excessive. See Liu v. Millenium Motors Sports, LLC, No. 17-cv-06438, 2021 WL 4268136, at *11 (E.D.N.Y. May 24, 2021) (noting that "[w]hen a plaintiff's billing record is excessive, it is within the court's discretion to reduce the

fees requested"); see also Thompson, 2020 WL 5822455, at *13 (reducing fees requested in the default judgment context).  And even if they are not reduced, those rates can at least inform the Court of what a reasonable rate might be in a contested case.

In this district, there are many FLSA cases awarding $450 per hour or close to it for heavily litigated cases.  That rate has been approved when the plaintiff's attorney is a leader of the employment bar and has obtained an excellent result.  See, e.g., Almond v. PJ Far Rockaway, Inc., No. 15-cv-06792, 2018 WL 922184, at *2 (E.D.N.Y. Feb. 15, 2018) (in a litigated case, awarding hourly rate of $450 to an attorney with 17 years of experience in employment and wage litigation, including litigating over 400 employment and wage cases in federal court, and arguing "a number of significant employment cases before the Second Circuit"); Hall v. ProSource Techs., LLC, No. 14-cv-2502, 2016 WL 1555128, at *12 (E.D.N.Y. Apr. 11, 2016) (in a heavily litigated case, approving rate of $450 per hour for a lawyer with "significant experience litigating FLSA and NYLL wage and hour lawsuits", and in light of his "capable representation and favorable result achieved in this action [a settlement of $1,125,000]"); see also Christian v. Metro. Specialty Lab's, Inc., No. 17-cv-04721, 2019 WL 3729458, at *10 (E.D.N.Y. Aug. 8, 2019) (noting that "attorneys of significant experience and reputation in the district have been awarded hourly rates ranging from $300.00 to $450.00").

The problem with plaintiff's fee application, however, is that this is not one of those cases.  Mr. Troy has an impressive resume of speaking engagements and bar association activities, but Troy Law also has innumerable cases criticizing its conduct.  Moreover, as discussed above, although the result counsel obtained was not "subpar," Troy Law offers no defense of the settlement as a fraction of the maximum possible recovery.  Perhaps more importantly, the settlement did not result in any recovery against the individual defendant and

two of the entity defendants.  If defendants have accurately described the sole judgment debtor as being in financial distress, it may turn out the judgment obtained is not worth very much.

In addition to that, the submissions by plaintiff's counsel in this case were poorly done overall.  There is a severe and persistent problem in the office of plaintiff's attorney with proofreading.  Defendants allude to the unusual number of factual, typographical and grammatical mistakes, and that criticism is accurate.  For example, Mr. Troy's affidavit in support of the instant motion, in seeking to describe his associate's experience, states: "As the lead-counsel and first-chair trial attorney in this case, Mr. Schweitzer obtained a unanimous jury verdict and damages for Plaintiffs in the amount of $65,394.00 before interest."  Not exactly. This case resulted in a $100,000 judgment pursuant to Rule 68(a).  There was no jury trial, and no $65,394 damage award.  That misstatement must have been lifted from some other case. There are also numerous references to this Court as the Southern District of New York, which it is not, likely stemming from a similarly flawed drafting process.

One of the more peculiar errors in the instant motion is the statement on the first page of plaintiff's moving memorandum that "[t]here is no dispute that Defendants are jointly and severally liable for offer of judgment amount [sic] proffered."  That is flat out wrong.  The Rule 68(a) offer plaintiff accepted is clear on its face that although the judgment discharges plaintiffs' claims against all of the defendants, the only defendant against which judgment will be entered is Deenora Corp.

This is particularly surprising because it is the second time plaintiff's counsel has made this mistake within a short period of time.  The form of judgment counsel submitted and which the Court mistakenly entered made all defendants jointly and severally liable.  Defendants' counsel contacted plaintiff to try to obtain a stipulation to amend the judgment, but plaintiff's

counsel refused.  It took another motion by defendants to amend the judgment.  That all occurred only 60 days before plaintiff filed its motion for attorneys' fees, and yet Troy Law apparently forgot about it and made the same mistake of asserting joint-and-several liability again in the instant fee motion.

One would think that with defendants' opposition to this motion having vigorously attacked Troy Law's work in the case and on this motion as sloppy, Troy Law would be especially careful in submitting their reply papers.  Not so.  Even in plaintiff's reply memorandum on this motion, in responding to defendants' accusation that Troy Law's claimed hourly rates only occurred in the default judgment context, Troy Law asserts: "In contrast to the cherrypicked cases chosen by Littler Mendelson, P.C., courts in this district have routinely awarded Troy Law's attorneys and employees rates similar to those requested."

First, Littler Mendelson, P.C. is not the law firm representing defendants in this case. The firm representing defendants is Kaufman, Dolowich & Voluck, LLP.  That doesn't even sound similar to Littler Mendelson, P.C.  If, after the severe attacks that defendants have launched on plaintiff's fee application, plaintiff's law firm still can't get the basics right, then it is not performing at a level for which the top FLSA rates in this district are awarded.  It substantiates defendants' claim that Troy Law's work is often the product of cutting-and-pasting from other cases with little or no review.

Second, instead of confronting defendants' point that the cases on which plaintiff relies to establish a reasonable rate were in the default judgment context, plaintiff's attorney doubles down by citing almost entirely the same cases again, avoiding the issue of the appropriate fee in litigated versus default judgment cases.

Some of defendants' criticisms are petty, but taken together, and using my own evaluation of the quality of the work of plaintiff's counsel, the top rates in this district in FLSA cases were not nearly earned. I am therefore applying a 20% reduction to the hourly rates of each timekeeper. That, in my view, results in reasonable hourly rates consistent with those awarded in this district. See, e.g., Callari v. Blackman Plumbing Supply, Inc., No. 11-cv-3655, 2020 WL 2771008, at *9 (E.D.N.Y. May 4, 2020) (noting that "[i]n the Eastern District of New York, prevailing rates range from $300 to $400 per hour for experienced attorneys, $200 to $300 per hour for senior associates, and $100 to $150 per hour for junior associates" and awarding hourly rates of $380 to a partner, $200 and $150 to two associates, and $70 to a paralegal); Jianmin Jin v. Shanghai Original, Inc., No. 16-cv-5633, 2020 WL 4783399, at *5 (E.D.N.Y. Aug. 18, 2020) (reducing hourly rate of Troy from $550 to $375, Schweitzer from $350 to $150, junior associates from $250 to $150 or $100, and paralegals from $150 to $75); Singh v. A&A Market Plaza, Inc., No. 15-cv-7396, 2019 WL 4861882, at *11 (E.D.N.Y. Sept. 30, 2019) (awarding an hourly rate of $375 to Troy, $150 to Schweitzer in a FLSA case that proceeded to trial).

### 7. Amount of time expended

The time records in support of plaintiff's counsel's bill were also carelessly prepared. For example, Mr. Troy charged .5 hours to "Review Magistrate Judge Individual Practices." There was never a Magistrate Judge assigned to this case. And it is not a typographical error because two days earlier, Mr. Troy had billed another .5 hours to "Review District Judge Individual Practices." In addition, defendants have submitted an affidavit and exhibits showing that although Mr. Schweitzer billed 8.75 hours for defending the deposition of one of the plaintiffs and 4.17 hours taking the deposition of one the defendants, he in fact took lengthy

16

breaks during both depositions to take telephone calls in other cases.  Troy Law has not responded to or addressed this proof.

Defendants' opposition to the fee motion contains numerous criticisms of specific time entries.  There are over 30 different charges that defendants attack, too numerous to address individually.  Some of the criticisms are simply defendants' opinions of how much time particular tasks should have taken.  Others reflect a demand for a level of efficiency which few law firms can attain.  However, others point to clearly excessive time charges.

Together with the overcharges mentioned in the first paragraph of this subsection, there is enough validity to defendants' attack to undermine the Court's confidence in the accuracy and reasonableness of the time entries.  The Court will therefore reduce the time charges by 15%. See Green v. City of New York, 403 F. App'x 626, 630 (2d Cir. 2010) (recognizing "the authority of district courts to make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application") (quotations and citations omitted).

### 8.  Recovery of costs

Defendants correctly point out that in fee applications, plaintiffs are required to submit proof of the costs that they claim to have incurred.  See Ganci v. U.S. Limousine Serv. Ltd., No. 10-cv-3027, 2015 WL 1529772, at *8 (E.D.N.Y. Apr. 2, 2015).  Plaintiff has not done that here, not even in reply once defendants pointed out the omission.  Nevertheless, the costs consist almost entirely of the $400 filing fee, of which the Court can take judicial notice, and one deposition transcript for $776.20, a reasonable cost for a deposition transcript.  The Court will award the costs as claimed in the amount of $1,192.36.[4]

---

[4] Defendants' have also moved to strike a late exhibit filed by plaintiff.  The motion is denied as unnecessary.  The Court gave no consideration to that exhibit because it is immaterial.

**CONCLUSION**

With the reduction in hourly rates and time charges set forth above, plaintiff's claim for fees reduces to $36,405.50.  The motion is granted to the extent that fees are awarded in that amount plus costs of $1,192.36.  The Clerk is directed to enter a Second Amended Judgment consistent with this decision.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
      December 2, 2021